IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAMALAH AYAPPONEY<br><br>    Plaintiff,<br><br>    v.<br><br>SUKOMARAN KUNIKIRAMAN,<br><br>    Defendant. | Civil Action No. _____<br>FILED: JULY 21, 2008<br>08CV4133<br>JUDGE ST. EVE<br>MAGISTRATE JUDGE COLE<br><br>PH |

## **COMPLAINT**

    Plaintiff Shamalah Ayapponey, by and through her undersigned attorneys, hereby alleges as follows:

### INTRODUCTION

    1.    Ms. Ayapponey is a victim of unfair employment practices and human trafficking. In early 2005, she traveled from Malaysia to this country to live with and work for Defendant Sukomaran Kunijiraman. It was not until after Ms. Ayapponey arrived in the United States that she discovered she would be required to work for the Defendant seven days a week for wages equating to less than one dollar per hour. Ms. Ayapponey was unable to leave Defendant's employ because he kept possession of her passport and restricted other aspects of her financial and personal freedom. Ms. Ayapponey brings this civil action under the Fair Labor Standards Act ("FLSA"), the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and state common law. By this complaint, Ms. Ayapponey seeks redress for these employment and civil rights violations.

## JURISDICTION AND VENUE

2.      Jurisdiction of the subject matter of this action is established under 28 U.S.C. § 1331, the FLSA, 29 U.S.C. § 201 *et. seq.*, and the TVPRA, 18 U.S.C. § 1589 *et. seq.*

3.      This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over the related state law claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

4.      This court has specific and general personal jurisdiction over Defendant. Defendant resides in Illinois.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, and because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

6.      Ms. Ayapponey is a 55-year old Malaysian citizen.

7.      From approximately March 14, 2005 until approximately July 14, 2006, Ms. Ayapponey resided in Glenview, Illinois. She currently resides in Chicago, Illinois.

8.      Defendant is a resident of Glenview, Illinois and, upon information and belief, is currently employed as the Chicago Director of the Malaysian Industrial Development Authority.

## FACTS

### TRAVEL FROM MALAYSIA TO CHICAGO

9.      While living in Malaysia in early 2005, Ms. Ayapponey was informed by Defendant's sister-in-law that Defendant needed someone to come to the United States to care for his son.

10. Ms. Ayapponey agreed to speak with Defendant's wife, who was also living in Malaysia, about the job.

11. In February 2005, Defendant's wife spoke with Ms. Ayapponey and provided more details about the position.

12. Defendant's wife informed Ms. Ayapponey that she would be responsible for taking care of Defendant's son.

13. She told Ms. Ayapponey that she would have ample free time to watch movies and attend religious activities if she desired.

14. After accepting the position, in February or March 2005, Defendant's wife and sister-in-law took Ms. Ayapponey to the United States embassy in Malaysia to obtain a visa for her.

15. In March 2005, the embassy issued Ms. Ayapponey's visa. Defendant was listed on the visa as her sponsor. (*See* Exhibit A, Ms. Ayapponey's visa.)

16. On March 14, 2005, Ms. Ayapponey flew from Kuala Lumpur, Malaysia, to Chicago. Upon information and belief, the trip was arranged by Defendant.

17. Defendant confiscated Ms. Ayapponey's passport and visa shortly after her arrival in Chicago.

**MS. AYAPPONEY WORKS AS A "$10 SLAVE"**

18. On the day Ms. Ayapponey arrived in the United States, Defendant informed Ms. Ayapponey that her job would not be to care for Defendant's son, but rather to complete household chores each day.

19. Ms. Ayapponey's list of duties included cleaning bathrooms, washing windows, doing laundry, ironing, sweeping, mopping, vacuuming, cooking all of Defendant's meals, shoveling snow and tending to Defendant's yard and garden.

20. This long list of duties required Ms. Ayapponey to work constantly, working seven days a week and, at a minimum, 340 hours per month.

21. Ms. Ayapponey rarely had the opportunity to sit down or rest during the majority of her workdays. Ms. Ayapponey never had a full day off in the approximately 485 days she worked for Defendant (Ms. Ayapponey would typically work half-days on Sundays).

22. Defendant did not pay Ms. Ayapponey any money for her services until April 1, 2005, two weeks after she arrived.

23. On April 1, 2005, Defendant deposited $150 in a bank account he had set up for her.

24. Each month thereafter, from May 2005 until June 2006, Defendant deposited $300 in the account he set up for Ms. Ayapponey. (*See* Exhibit B, Ms. Ayapponey's pay stub, signed by Defendant.)

25. In other words, Defendant paid Ms. Ayapponey $10 per day of work at a rate of less than $1 an hour.

26. When Ms. Ayapponey told one of Defendant's neighbors about her situation, the neighbor remarked that Ms. Ayapponey deserved better than to work as a "$10 slave."

27. Even worse, Ms. Ayapponey was subjected to verbal, mental and sexual harassment at her less than $1-per-hour job.

28. Defendant subjected Ms. Ayapponey to verbal abuse throughout her employment for Defendant.

29. Defendant was also extremely controlling of Ms. Ayapponey.

30. On at least one occasion, Defendant also subjected Ms. Ayapponey to sexual harassment.

### DEFENDANT ALLOWED MS. AYAPPONEY'S VISA TO EXPIRE

31. Ms. Ayapponey's visa ran from March 3, 2005 to March 1, 2006. (*See* Exhibit A.)

32. In February 2006, when Ms. Ayapponey reminded Defendant that her visa was nearly expired, Defendant assured Ms. Ayapponey, "I have done everything for you; no need to worry," and kept the passport and visa.

33. In late 2005 or early 2006, one of Defendant's neighbors convinced Ms. Ayapponey that she should not be working in these conditions.

34. In or about May 2006, Ms. Ayapponey informed Defendant that she wanted to stop working for him and return to Malaysia.

35. Defendant stated that Ms. Ayapponey could not leave because he had to entertain a large group of business associates in the coming days and directed Ms. Ayapponey to stay and continue working in his home.

36. On or about July 10, 2006, one of Defendant's neighbors whom Ms. Ayapponey befriended went to Defendant's home to demand that Ms. Ayapponey be given access to her passport.

37. Defendant initially refused, stating that it would be "breaking the laws" if he gave Ms. Ayapponey the passport.

38. The next day, however, he relented and gave it to her.

39. Despite Defendant's representations, when Ms. Ayapponey opened her passport, she learned that Defendant never renewed her work visa.

40. Ms. Ayapponey believed her presence in the United States was therefore illegal.

41. On or about July 12, 2006, Ms. Ayapponey spoke with Defendant's wife on the telephone about her working conditions and Defendant's conduct.

42. Defendant's wife told Ms. Ayapponey (at Defendant's direction, upon information and belief) that if she called the police she would be arrested and deported.

43. Based on this conversation and Defendant's failure to renew her visa, Ms. Ayapponey believed that if the Defendant called the police, she would be arrested and deported because of her illegal status.

### MS. AYAPPONEY'S ESCAPE FROM DEFENDANT'S HOME

44. On July 14, 2006, Defendant informed Ms. Ayapponey that she would be returning with Defendant to Malaysia in the next few days.

45. Ms. Ayapponey feared that she would be questioned by customs officials about her work for Defendant and that she would be punished for letting her visa expire and living in the United States illegally.

46. Later on July 14, 2006, Defendant informed Ms. Ayapponey they were leaving for Malaysia that afternoon, not in a few days, and that she should pack her things.

47. That day, Ms. Ayapponey left Defendant's home (by turning on the dryer as a distraction) and traveled to a neighbor's house.

48. Ms. Ayapponey watched as Defendant searched the neighborhood for her.

49. In the weeks following her departure from Defendant's home, Ms. Ayapponey found housing at a local shelter through the help of a friend.

### Ms. Ayapponey Is Found to Be a Victim of Human Trafficking

50. Ms. Ayapponey applied for and received an application for continued presence in the United States, which was granted on January 8, 2007.

51. On August 31, 2007, Ms. Ayapponey applied for a permanent T Visa as a victim of human trafficking.

52. A Special Agent of the Federal Bureau of Investigations submitted an affidavit in support of Ms. Ayapponey's application.

53. That Special Agent concluded that Ms. Ayaponney "has been a victim of a severe form of trafficking in persons as defined by the [Victims of Trafficking and Violence Protection Act of 2000]."

54. The United States Department of Homeland Security subsequently granted Ms. Ayapponey a permanent T Visa as a victim of human trafficking.

55. In granting the T Visa to Ms. Ayapponey, the United States Department of Homeland Security determined that Ms. Ayapponey showed the four prerequisites for a T Visa under 8 C.F.R. § 214.11(b): (1) she has been the victim of a severe form of trafficking in persons, (2) she is physically present in the United States because she was trafficked here to engage in forced labor, (3) she has been, and remains, willing to comply with all requests for assistance in the investigation and potential prosecution of her trafficker, and (4) she would suffer extreme hardship involving unusual and severe harm if she was removed.

## CLAIMS

### COUNT I
### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT (FLSA)

56. Ms. Ayapponey incorporates by reference paragraphs 1-55, as though fully set forth in this Count.

57. The FLSA provides that "any employee who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect [at the time of employment]." 29 U.S.C. § 206(f)(1). Regulations promulgated under the FLSA provide that "domestic service employees who reside in the household where they are employed are entitled to the same minimum wage as domestic service employees who work by the day." 29 C.F.R. § 552.102.

58. Defendant employed Ms. Ayapponey as a domestic worker from approximately March 14, 2005 until approximately July 14, 2006.

59. At all relevant times, Defendant was an employer pursuant to the FLSA.

60. At all relevant times, Ms. Ayapponey was an employee pursuant to the FLSA.

61. On information and belief, Defendant's housing and food were provided by the Malaysian government at no cost to Defendant.

62. At all relevant times, Ms. Ayapponey was employed in domestic service for more than eight hours in the aggregate every week.

63. Defendant never paid Ms. Ayapponey the minimum wage for the services she provided to him.

64. On information and belief, Defendant did not maintain any of the records required by federal regulations to deduct from Ms. Ayapponey's pay the costs of room and board for her.

65. Defendant knowingly and willfully required or permitted Ms. Ayapponey to work hours well beyond a normal work day, including working seven days a week, for as long as 15 hours per day, and knowingly and willfully failed and refused to pay Ms. Ayapponey the appropriate wages for hours worked as required under federal law.

66. Defendant knew, should have known, or showed reckless disregard for the FLSA provisions applicable to Ms. Ayapponey and willfully, intentionally and without good faith violated these laws.

67. Under FLSA, 29 U.S.C. § 216(b), Ms. Ayapponey is entitled to recover all unpaid wages, an additional amount as liquidated damages, and reasonable attorney's fees and costs in amounts to be proven at trial.

## COUNT II
### Violations of Trafficking Victims Protection Reauthorization Act
### Trafficking Into Servitude – 18 U.S.C. §§ 1590, 1595

68. Ms. Ayapponey incorporates by reference paragraphs 1-55, as though fully set forth in this Count.

69. The TVPRA provides:

> Whoever knowingly recruits, harbors, transports, provides or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1590.

70. The TVPRA's "Forced Labor" section states:

> Whoever knowingly provides or obtains the labor or services of a person . . . (3) by means of the abuse or threatened abuse of law or the legal process shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1589.

71. The TVPRA provides a private right of action:

> An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."

18 U.S.C. § 1595.

72. Defendant subjected Ms. Ayapponey to forced labor in violation of Section 1589 of the TVPRA by knowingly obtaining her services through an abuse of the legal process.

73. Specifically, Defendant deceived Ms. Ayapponey into giving up her passport and refused to renew her visa in order to restrict Ms. Ayapponey's ability to leave and cause Ms. Ayapponey to fear that she would be arrested and deported if she did not continue working for Defendant.

74. Defendant separately violated Section 1590 of the TVPRA by knowingly recruiting, harboring, obtaining or transporting Ms. Ayapponey to provide labor and services for the Defendant in violation of the TVPRA.

75. Specifically, Defendant, and agents at his direction, recruited Ms. Ayapponey to work for Defendant in the United States, sponsored her visa, and arranged her transportation to the United States so that Defendant could subject Ms. Ayapponey to the forced labor set forth herein.

76. As a result of Defendant's conduct, Ms. Ayapponey has suffered damages in an amount to be determined at trial.

77. Pursuant to 18 U.S.C. § 1595, Ms. Ayapponey is entitled to compensatory and punitive damages and reasonable attorney's fees for Defendant's violations of the TVPRA.

## COUNT III
**BREACH OF IMPLIED CONTRACT**

78. Ms. Ayapponey incorporates by reference paragraphs 1-55, as though fully set forth in this Count.

79. For approximately 16 months, Ms. Ayapponey provided services to Defendant in the form of domestic work as described above.

80. Defendant received the benefits of Ms. Ayapponey's services while paying her a fraction of the value for those services.

81. It would be unjust for Defendant to receive these benefits without paying compensation.

82. Defendant's retention of these benefits violates fundamental principles of equity, justice and good conscience.

83. As a result of Defendant's retention of benefits, Ms. Ayapponey has suffered damages in an amount to be determined at trial.

## JURY DEMAND

84. Ms. Ayapponey hereby demands a jury trial on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Shamalah Ayapponey respectfully prays that this Court enter judgment against Sukomaran Kunijiraman for:

1. compensatory and punitive damages in an amount to be proven at trial;

2. unpaid wages, including minimum wages, in an amount to be proven at trial;

3. pre- and post-judgment interest;

4. reasonable attorney's fees and costs; and

5. such other and further relief as the Court deems just and proper.

Respectfully filed this 21th day of July, 2008,

SHAMALAH AYAPPONEY

By:___/s/ Jeffrey Baltruzak____
   One of Her Attorneys

Geoffrey A. Vance
Amanda J. Metts
J. Christian Nemeth
Jeffrey Baltruzak
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois 60606
Tel: 312-372-2000
Fax: 312-984-7734



08CV4133
JUDGE ST. EVE
MAGISTRATE JUDGE COLE

PH

EXHIBIT A

PH

**Skamalah Salary**                                        K Sukomaran

| | | |
|---|---|---|
| March 2005 (½ month) | 150.00 | |
| April 2005 | 800.00 | |
| May 2005 | 300.00 | |
| June 2005 | 800.00 | |
| July 2005 | 300.00 | |
| August 2005 | 300.00 | |
| Sept 2005 | 300.00 | |
| Oct 2005 | 300.00 | |
| Nov 2005 | 300.00 | |
| Dec 2005 | 300.00 | |
| | | 2850.00 |
| Jan 2006 | 800.00 | |
| Feb 2006 | 300.00 | |
| March 2006 | 300.00 | |
| April 2006 | 300.00 | 1200.00 |
| | | 4050.00 |
| May 27 withdrawal | | 2000.00 |
| ~~May 2006~~ | | 2050.00 |
| May 2006 | 800.00 | ~~300~~ |
| June 2006 | 800.00 | |
| July 2006 (½ month) | 150.00 | |

EXHIBIT B